FILED
2007 Jul-09  PM 12:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LASHAN L. DIXON,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:06-cv-846-JHH** |
| **CVS PHARMACY, INC.,** | ) | |
| **d/b/a CVS BIG B, INC.** | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OPINION

The court has before it the May 2, 2007 motion (doc. #21) of defendant CVS Pharmacy, Inc. ("CVS") for summary judgment and the memorandum of law (doc. #22) in support thereof.

Having considered the briefs and evidentiary submissions, the court finds that defendant's motion (doc. #21) for summary judgment is due to be granted.

## I.    INTRODUCTION

Plaintiff LaShan Dixon ("Dixon") initiated this lawsuit (doc. #1) on May 1, 2006 by filing a complaint in this court.  The complaint asserts claims for: (1) violation of Title VII and the Pregnancy Discrimination Act (Count I) and (2) Negligence (Count II).  An Amended Complaint was filed May 19, 2006, changing

the name of defendant to CVS Pharmacy, Inc. d/b/a CVS Big B, Inc.  (See Doc. #5.)
No other substantive changes were made with the Amended Complaint.  (See Docs.
# 1, 5.)

Defendant CVS's May 2, 2007 motion (doc. #21) for summary judgment
asserts that no genuine issue of material fact exists and that CVS is entitled to
judgment as a matter of law as to all claims.  The parties have each filed briefs and
submitted evidence in support of their respective positions concerning the pending
motion for summary judgment.  On May 2, 2007 defendant CVS submitted evidence[1]
(docs. # 23, 24) in support of the motion (doc. # 21), and also submitted a supporting
memorandum of law (doc. # 22).  Plaintiff submitted evidence[2] (doc. # 32) in

---

[1] Defendant CVS submitted: the deposition of LaShan Dixon with exhibits 1-4, 6-14, and 16; the deposition of Richard Howard; the affidavit of Brian Fricks; the declaration of Steve Parrillo with exhibits A and B; the affidavit of Jeanne Norrgard with exhibit A; and the declaration of Paul Lehman, with exhibit A.

On May 11, 2007, defendant CVS made a supplemental evidentiary submission of the notarized affidavit of Jeanne Norrgard.  (See Doc. # 27.)  On May 15, 2007, CVS filed another additional evidentiary submission – "Individuals terminated for no hours worked."  (Doc. # 28.)

[2] Plaintiff submitted: the deposition of LaShan Dixon with exhibits DX1 - DX16 and PX1; the affidavit of LaShan Dixon, dated November 28, 2005, which was submitted to the EEOC; the transcript of the tape recorded conversation of Kimberly Clay with supporting affidavits; the affidavit of Brian Fricks, dated April 30, 2007; the letter from CVS to the EEOC, dated August 29, 2005; the CVS drug store interview applicant response; letter from Brian G. Fricks stating that Dixon was a CVS employee on leave of absence due to her pregnancy; CVS job data report for plaintiff; fulfillment check register for plaintiff; Your Guide to CVS; and plaintiff's

opposition to the motion for summary judgment on June 11, 2007 and on the same date submitted a brief (doc. # 33) in opposition to defendant's motion for summary judgment.  On June 18, 2007, defendant filed a reply brief (doc. # 34) to plaintiff's opposition.

---

2003 background screening order form.

Defendant's Reply (doc. # 34) to Plaintiff's Opposition to Defendant's Motion for Summary Judgment argues that plaintiff "attempts to create a genuine issue of material fact through an unauthenticated transcript of a former employee, Kimberly Clay, which is inadmissible hearsay and not verified by an affidavit as required by Rule 56(e)." (Doc. # 34 at 2.)  In support thereof, defendant contends that evidence used to create a genuine issue on summary judgment must not only be authenticated, but also generally admissible at trial.  (See id. at 3.)

Defendant has correctly stated the law governing evidence which may be considered by the court on summary judgment.  Although "uncertified or otherwise inadmissible documents may be considered by the court if not challenged," (Wright & Miller, 10A F.P.P. Civ. 3d § 2722), defendant has indeed challenged the admissibility of the transcript of Clay.  *Otherwise admissible* evidence may be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form.  See McMillan v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996).  The transcript which plaintiff seeks to present into evidence here is not otherwise admissible.  See Macuba v. Deboer, 193 F.3d 1316, 1325 (11th Cir. 1999) ("We believe that the courts have used the phrases 'reduced to admissible evidence at trial' and 'reduced to admissible form' to explain that the out-of-court statement made to the witness [the Rule 56(c) affiant or the deposition deponent] must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all [because it is not offered to prove the truth of the matter asserted], or is used solely for impeachment purposes [and not as substantive evidence]") (holding that the district court improperly considered hearsay evidence contained in an affidavit at the summary judgment stage because those statements were being offered for the truth of the matter asserted and none of the statements would be admissible at trial under an exception to the hearsay rule.)  Therefore, the court cannot consider the transcript of the telephone conversation which plaintiff seeks to enter here into evidence.

Pursuant to the court's orders of May 8, 2007 (doc. # 25) and June 4, 2007[3] (doc. # 31), the motion (doc. #21) for summary judgment is now under submission. Said motion is considered herein.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 134 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-12 (1993); Nix v.

---

[3] On May 29, 2007 Plaintiff filed a Rule 56(f) Motion Requesting: the Court Refuse Defendant's Application for Summary Judgment Or, in the Alternative, for a Continuance to Permit the Deposition of Kimberly Clay.  (See Doc. # 29.)  That motion was denied by order (doc. # 31) dated June 4, 2007.  However, the court did allow plaintiff several additional days within which to file any additional opposition to defendant's motion for summary judgment.

WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981), as modified by Desert Palace v. Costa, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination. See Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).

Under the McDonnell Douglas/Burdine scheme, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of discrimination. Once the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-54; Desert Palace, 539 U.S. at 101-02.  The court is aware that the summary judgment rule applies in job discrimination cases just as

in other cases.  Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000)

(rejecting an earlier, contrary general rule and emphasizing that no thumb is to be

placed on either side of the scale).

## III.   STATEMENT OF FACTS[4]

### A.   Business and Policies of CVS

CVS is a retail drug chain with approximately 6200 stores operating in 43

states.  (See Doc. #22 at 3.)  In the Birmingham area, CVS operates numerous stores,

including Store No. 4829 on Green Springs Avenue.  (See Howard Dep. at 10.)  It

was with Store No. 4829 that plaintiff LaShan Dixon ("Dixon") was employed as a

cashier from June 2003 until approximately March 20, 2005.  (See Fricks Aff. at ¶ 3;

see also Doc. # 32, Exh. E.)

Although Dixon never saw or received a handbook,[5] CVS does maintain an

employee handbook titled "Your Guide to CVS."  (See Norrgard Decl. at ¶ 1; see also

Pl. Dep. at 62-63.)  The Guide outlines policies relevant to a "respectful workplace,"

---

[4] These are the facts for summary judgment purposes only.  They may not be
the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400
(11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing
the rulings on the summary judgment motion [ ] may not be the actual facts'")
(citation omitted).  Where the facts are in dispute, they are stated in the manner most
favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

[5] There is no signed acknowledgment of receipt of the handbook in the record
for Dixon and Dixon denies that she ever saw or received a handbook.  (See Doc. #
33, Exh. K at CVS0217.)

including policies on workplace harassment, sexual harassment, and workplace violence. (See Exh. A to Norrgard Decl. at CVS 0190-0194.) The Guide also includes a section pertaining to leaves of absence. (See Doc. # 32, Exh. K.) In accordance with that section, employees who need to request a leave of absence must:

- provide reasonable notice to their immediate supervisor;
- request a leave of absence form from their immediate supervisor;
- complete and sign the leave of absence form and return it to their immediate supervisor; and
- obtain approval from the Leave of Absence Coordinator or the Human Resources Manager.

(See Doc. #32, Exh K at CVS 0178.) "The company will grant employees the needed time off from work for certain circumstances, *while allowing them to maintain employment and continuous service with the company*." (Id. at CVS0179) (emphasis added.)

CVS also maintains a policy on criminal background screening. The company requires all candidates who accept job offers to submit to a criminal background check.[6] (See Parrillo Decl. at ¶ 3.) During the screening process, candidates who

_____

[6] Plaintiff disputes that the criminal background screening is required of all applicants over 18 years of age. (See Doc. # 33 at 2.) However, plaintiff cites no evidence in support of the contention that this is a disputed fact. (See id.) Therefore, the court will assume, for purposes of summary judgment, that CVS does in fact require a criminal background screening of all applicants over 18 years of age. See FED. R. CIV. P. 56 (e) ("When a motion for summary judgment is made and supported as provided in the rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or

receive a "HIT" revealing a felony conviction are denied employment.  (See id.)  In the years since CVS has implemented this program, there have been no known individuals within the area encompassing Store No. 4829 who have been hired despite a pre-existing felony conviction.  (See Lehman Decl. at ¶ 5.)

## B.    The CVS Leave of Absence Policy

CVS maintains a computer program titled C_PER037 which automatically reviews the CVS employee database and purges the database of individuals who have not actively worked within a 45-day work period.[7]  (See Norrgard Aff. at ¶¶ 4-5.) This program does, however, bypass employees who have initiated a leave of absence in accordance with policy.[8]  (See id. at ¶ 7.)  "Your Guide to CVS" provides that for work scheduling concerns, employees are required to first contact their supervisor

---

otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial").

[7] Plaintiff disputes that the database automatically purges individuals who have not actively worked for a 45-day period.  (See Doc. # 33 at 2.)  However, plaintiff cites no evidence in support of the contention that this is a disputed fact, instead baldly stating: "Defendant's statement that there is no manual intervention involved is disputed because it is unsupported in the defendant's motion and vague as to what regard there is no manual intervention."  (Doc. # 33 at 3.)  In fact, Norrgard's affidavit is uncontroverted as to this point.  Therefore, the court will assume, for purposes of summary judgment, that there is no manual intervention involved.  See also FED. R. CIV. P. 56(e) and footnote 6, supra.

[8] See footnote 6, supra and FED. R. CIV. P. 56(e).  The court will assume, for purposes of summary judgment, that the program automatically bypasses employees who have applied for and received an approved leave of absence.

concerning the leave of absence. (<u>See</u> Howard Dep. at 28.) The store manager is then required to give the employee advice on calling the automated system. (<u>See</u> <u>id.</u> at 24-25, 28; <u>see</u> <u>also</u> Fricks Aff. at ¶¶ 7-10.)

After the Leave of Absence Department receives the request, the request is processed. (<u>See</u> Howard Dep. at 48.) CVS's general leave of absence policy stipulates that failure to follow the appropriate leave procedures may result in the employee being terminated from employment for no hours worked. (<u>See</u> <u>id.</u> at 51; <u>see</u> <u>also</u> Exh. 12 to Dixon Dep.) In such a situation, the computer program will automatically assign an effective termination date based on the individual's last date of work.[9] (<u>See</u> Norrgard Aff. at ¶ 8.)

Dixon testifies that she was not aware of the formal requirements of the leave of absence policy. Although she admits that she called an automated line on numerous occasions to acquire information about her paycheck, she denies that she knew what number to call for human resources and denies that she ever spoke to anyone in human resources at CVS. (<u>See</u> Pl. Dep. at 77-81.) She also denies that she ever saw any bulletin boards or other postings which included a number to call for human resources. (<u>See</u> <u>id.</u> at 79-80.) She denies that she ever had a problem with her

---

[9] Plaintiff disputes this point to the extent it implies the listed employees are always actually terminated. (<u>See</u> Doc. # 33 at 3.)

9

employment requiring her to talk to anyone in human resources.  (See id. at 81.)  She denies that she ever heard of the CVS Contact Support Center, and denies that she was ever given, or even saw, a CVS employee "ezone" card.  (See id. at 126-27.)  She denies that she ever saw a CVS document titled How to Report a Claim for Work Related Leave.  (See id. at 126-27, 136.)

### B.    Dixon's Employment with CVS

#### 1.    The Original Application

Dixon applied for a cashier position with CVS in June 2003.  (See Def.'s Exh. 1 to Dixon Dep.)  Her application for employment indicated that she had "been convicted of, pled guilty to, or pled no contest or nolo contendre to a crime other than a minor traffic violation."  (Id.)  The application, however, leaves blank the section which requested the applicant to describe the nature of the crime, when it occurred, and subsequent rehabilitation.[10]  (See id.)

Shortly after turning in the application to a CVS employee, Dixon spoke with the hiring and assistant manager, Kimberly Clay.  (See Pl. Dep. at 21.)  "She looked over my application.  She asked about my availability.  She also let me know what

---

[10] Plaintiff's deposition testimony reveals that she had previously pled guilty to stealing property, including televisions, clothes, and food, from Sam's Club while she was an employee there.  (See Pl. Dep. at 35-37.)  Plaintiff also admitted during the course of her deposition that she had stolen other property and money from previous employers.  (See id. at 46-57.)

shift they were hiring for, what kind of work they do." (Id. at 22.)  Dixon was told

that she would have to meet with the store manager, Brian Fricks, for a second

interview.  (See id. at 25.)  The second interview took place at the Green Springs

store.  (See id. at 26.)  Fricks asked Dixon questions similar to the ones Clay had

asked, and told Dixon a little bit more about the company.  (See id. at 27.)  Neither

Fricks nor Clay questioned Dixon about her felony conviction or her employment at

Sam's Club.  (See id. at 57.)

   As part of her 2003 application for employment, Dixon signed an

Authorization and Release for CVS to complete a criminal background check on her.

(See Exh. 2 to Dixon Dep.)  Dixon's screening form was sent to HireCheck on or

about July 2003 and came back as "clear" despite the fact that Dixon did have a

felony conviction.  (See Parrillo Decl. at ¶ 10.)  The search was flawed because

Dixon's first name was misspelled ("LaShon" instead of "LaShan")[11] and the court

where the conviction was filed did not have a social security number on file.  (See id.

and Exh. A thereto.)

   Dixon was thereafter hired for the cashier position on the second shift, 3:00

p.m. to 11:00 p.m.  (See id. at 28-29, 33.)  Her effective date of hire was July 22,

---

[11] Plaintiff's name was spelled incorrectly not on the initial background screening order form (see doc. # 32, exh. L) but on the report received back from HireCheck, the third party vendor conducting the search (see exh. A to Parrillo Decl.).

11

2003.  (See Doc. # 32, Exh. H.)

### 2.    Plaintiff's Work History and Advancement

Fricks supervised Dixon throughout her employment with the company.  (See Fricks Aff. at ¶ 4.)  In July 2004, Fricks gave Dixon an "Outstanding Performance" evaluation rating and was complimentary of her work.  (See Pl. Dep. at 66-67; see also Exh. 4 to Pl. Dep.)  On November 21, 2004, Fricks promoted Dixon to shift supervisor; the advancement was surprising to Dixon because she did not expect "it would come so soon."  (Pl. Dep. at 73.)  With the promotion, Dixon received an increase in pay, as well as an increase in responsibility.  (See id. at 70-73.)  She was trained by Fricks and Clay on responsibilities consistent with becoming a shift supervisor: opening register drawers, opening the office, learning the combination to the safe, monitoring the money and keeping up with employee time on the computer. (See id. at 73-76.)

### C.    Dixon's Request for Maternity Leave

Some time before the promotion in November 2004, Dixon informed Fricks that she was pregnant.  (See id. Fricks Aff. at ¶ 5.)  Then, midway through the pregnancy, Dixon approached Fricks to inquire about taking some time off surrounding the birth of her child.  (See id. at ¶ 6.)  Fricks appeared to be understanding and sympathetic to Dixon's situation.  (See Pl. Dep. at 89-90.)

According to Dixon, he informed her that she would have to write a letter stating when she would be leaving and when she would be coming back.  (See id. at 92-93.) Dixon complied with this request approximately a week later.[12]  (See id. at 96.)  "I put on there I want to return – I mean, leave on February 28th of '05 and return June 6th of 2005."  (Id. at 94.)  Fricks said "okay" which "led [Dixon] to believe that it was okay for me to go on maternity leave.  I mean, if I had to do something else, by him being my store manager and him supposed to be guiding me on the right way to do things, he was – I just felt like if there were anything else, he should have said so." (Id. at 96-97, 136.)  "I just assumed the proper procedure [to request maternity leave] was to notify your immediate supervisor."[13]  (Id. at 136, 140-42.)  In fact, according to Dixon, she later reminded Fricks about her impending maternity leave and he said "okay."  (Id. at 96.)  On her last day of work before leave, Dixon again talked with Fricks about her leave and later return to work.  (See id. at 97-99.)

---

[12] The letter does not appear in plaintiff's personnel file.  (See Pl. Dep. at 84-85.)

[13] Fricks contends that he informed Dixon to contact human resources and request an approved leave of absence.  (See Fricks Aff. at ¶ 7.)  He also contends that he advised her that she would risk falling out of the system if she did not apply for leave.  (See id. at ¶ 8.)  However, Fricks did write a letter to Dixon's apartment manager indicating that Dixon was on maternity leave.  (See Exh. 13 to Pl. Dep.) Dixon received the letter from Fricks regarding her leave status after her last day of work for CVS but before her baby was born.  (See Pl. Dep. at 139-40.)

**D.     Dixon's Attempt to Return to Work at CVS**

Dixon's daughter was born on April 29, 2005.  (See Exh. 6 to Pl. Dep.)
Approximately three weeks later, Dixon attempted to use her employee discount card
at a CVS on Lomb Avenue, but it was declined.  (See Pl. Dep. at 115-16.)  When
Dixon contacted Fricks about the situation, Fricks intimated that he knew that she had
fallen out of the system because of the time she had not worked, and encouraged her
to re-apply for her position.  (See Pl. Dep. at 115-16; see also Fricks Aff. at ¶ 13-16.)

Dixon went to the Green Springs store to re-apply for her position, even though
she did not think that she should have had to reapply for her job because she thought
she was out on approved maternity leave.  (See Pl. Dep. at 117-18, 123, 178.)  In
doing so, she re-signed her original application of June 2003 and re-signed the
consent to run a background check.  (See id. at 116-19.)  This time, Dixon's name
was spelled correctly[14] and the background check screening came back with a "hit,"
revealing Dixon's conviction for felony theft in the second degree.  (See Exh. 9 to Pl.
Dep.)  On or about June 14, 2005, Dixon received a Pre-Adverse Action Letter from
CVS which stated that a decision was pending on her application for employment due
to the background check which revealed a felony conviction. (See Exh. 8 to Pl. Dep.)
Thereafter, Dixon was informed that her application for re-employment was denied.

---

[14] See footnote 11, supra.

(See Exhs. 8, 10 to Pl. Dep.)

Dixon met with Clay at the Bluff park store to discuss the situation.[15]  (See Pl.

Dep. at 122-24.)

> A:   So I called [Clay].  And she said she got the same information and
> that she wanted me to come in, because she was kind of busy at
> that time.  So I said okay.
>
> So I went in to the Bluff Park store.  And she showed me parts of
> my application, and she showed me my background check.
>
> And I told her, well, I wasn't surprised because I checked yes on
> my application, you know.  I thought that they already knew that
> I had a felony.
>
> And I was like, okay, I'm still supposed to have my job.  I was on
> maternity leave.
>
> And she goes – I said, well – no, then she goes, no, they didn't
> know, and she showed me the first background check and they
> got that came back clear.
>
> Then she showed me this one, the one that she got as well as I did
> in the mail, and it did come up on there.  And I was like well, still
> I'm supposed to have my job.
>
> And she said sorry, there is nothing I can do.  Then I said okay,
> and I just left.

(Pl. Dep. at 122-23.)

---

[15] By the time Dixon received the Adverse Action letter, Fricks was no longer
employed by CVS.  (See Pl. Dep. at 122.)  Therefore, Dixon met with Clay regarding
the letter.  (See id.)

## IV.   ANALYSIS

### A.   Title VII Pregnancy Discrimination (Count I)

#### 1.   The basics of the Pregnancy Discrimination Act.

The Pregnancy Discrimination Act ("PDA") provides that the prohibition against sex-based employment discrimination in § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), applies with equal force to discrimination on the basis of pregnancy, childbirth, or related medical conditions.  See 42 U.S.C. § 2000e(k).  Women affected by pregnancy "shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . ."  Id.  Thus, the analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits.  See Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994).

To establish a prima facie case of pregnancy discrimination, a plaintiff must show: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position or benefit sought; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules.[16]

---

[16] The parties agree that this standard constitutes the prima facie case of pregnancy discrimination.  (See Doc. # 33 at 22-23; see also Doc. # 21 at 16.)

See Spivey v. Beverly Enterprises, Inc., 196 F.3d 1309, 1312 (11th Cir. 1999); see also McDonnell Douglas, 411 U.S. at 802-05.  If plaintiff succeeds in establishing the prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  See McDonnell Douglas, 411 U.S. at 802-05.   Once the employer has articulated a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason offered by the employer was merely a pretext for discrimination.  See Perryman v. Johnson Prods. Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).   That is, the plaintiff retains, at all times, the burden of establishing that the employer *intentionally* discriminated against herself as a pregnant employee.

### 2.    Plaintiff has established a prima facie case of discrimination.

The establishment of the prima facie case hinges, for the plaintiff herein, on whether there is evidence that she as an individual was treated unfavorably as compared to other, non-pregnant CVS employees.[17]  Plaintiff's complaint essentially

---

[17] Early in the argument section of her brief in opposition to summary judgment, plaintiff contends that "on it's face, CVS's termination after no hours worked policy strongly suggests an intent to discriminate against women who are pregnant or have pregnancy-related conditions" because "who else is likely to miss 45 days with no hours worked other than the pregnant, the aged, the disabled?" (Doc. # 33 at 23-24.)   To the extent that this is an attempt to state a claim for disparate impact (see doc. # 33 at 23-24; see also doc. # 34 at 5-6), such claim must fail

alleges two such violations:[18] (1) Defendant violated the PDA when it failed to restore the plaintiff to a substantially similar position upon her return from maternity leave (and instead terminated her employment) and (2) Defendant violated the PDA when it required the plaintiff to re-apply for her job upon her return from maternity leave. (See Amend. Compl., Count I at ¶¶ 21-23.)

Thus, essential to her prima facie case, plaintiff must establish that other employees, having been on approved[19] leave for reasons other than pregnancy, were automatically reinstated following that leave.  In Dixon's favor on this point is CVS's employment manual, which clearly states: "The company will grant employees the

because plaintiff has failed to produce any evidence demonstrating causation.  See Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994) ("To establish a prima facie case of disparate impact, a plaintiff must first identify the specific employment practice that allegedly has a disproportionate impact.  Next, the plaintiff must establish causation by offering statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination") (internal citations omitted).

[18] The court reviewed the amended complaint to gain insight on the bases upon which the plaintiff brought her claim for pregnancy discrimination.  Such review was necessary because plaintiff's response in opposition to defendant's motion for summary judgment did not clearly delineate those bases.  (See Doc. # 33 at 21-28.) The court was not the only reader left scratching their head.  "In her often confusing opposition, Dixon seems to argue that CVS engaged in disparate treatment and that its termination policy resulted in disparate impact . . . Dixon has not articulated what benefit she was denied that other non-pregnant employees received."  (Doc. # 34 at 3-4.)

[19] Because a real dispute exists on the record regarding whether the leave was approved, the court will assume for this analysis that the leave was approved, as such an assumption is most favorable to plaintiff.

needed time off from work for certain circumstances, *while allowing them to maintain employment and continuous service with the company.*"[20]   Indeed, an inference of discrimination may arise where a pregnant employee returning from maternity leave is treated contrary to the employment manual.  See Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1537-38 (11th Cir. 1987) (holding that plaintiff "made out a prima facie case of sex discrimination by showing that while on approved maternity leave of absence, she was replaced as a department manager by a male, and that when she returned she received a dissimilar and lesser position contrary to the clear implication contained in the language of the Wal-Mart handbook to the effect that an employee granted a leave of absence can expect to return to his place of employment in a 'similar capacity'"); see also Allen v. Montgomery County, Ala., 788 F.2d 1485, 1489 (11th Cir. 1986) ("Evidence produced below indicated that the appellant was the only employee to have ever taken maternity leave, and that she was the only employee – male or female, black or white – to not have been reinstated to her prior

---

[20] The court is giving plaintiff the benefit of the doubt here.  Her brief in opposition to summary judgment fails to mention this essential sentence in "Your Guide to CVS." Defendant also sweeps this sentence under the rug, instead focusing on the *disputed* issue of whether or not the leave was approved.  (See Doc. # 34 at 4-5.)  "Ignoring Dixon's pregnancy would still have left CVS with an employee who was out of work for 45 days without an approved leave of absence.  CVS, as per its policy, was therefore entitled to terminate Dixon as long as it terminated all similar employees who were absent from their position without following the proper channels to request leave."  (Id. at 5.)

position upon return from leave of any type"). Thus, plaintiff squeaks by, and has established the inference of discrimination. The burden now shifts to CVS to articulate a legitimate, non-discriminatory reason for the challenged action.

### 3. The articulated legitimate, non-discriminatory reasons for the challenged behavior.

CVS contends that it has established a legitimate, non-discriminatory reason for plaintiff's termination – "a computer program automatically terminated her employment after she failed to log any work hours during a 45-day period, as she was not coded as being on approved leave of absence." (Doc. # 22 at 18.) The company also contends that it has established a legitimate, non-discriminatory reason for requiring plaintiff to reapply for her position and thereafter declaring her ineligible for rehire. "CVS requires all individuals who were terminated and wish to be reinstated to reapply and submit to a background check. CVS policy prohibits the employment of individuals with prior felony convictions." (Doc. # 22 at 21-22.)

Thus, the burden shifts back to plaintiff to establish that these articulated legitimate, non-discriminatory reasons are a pretext for pregnancy discrimination.

### 4. Plaintiff cannot establish pretext.

Although not clearly delineated in her opposition, plaintiff seems to argue that

pretext is present in each situation because[21] she was not advised to call the automated line and was otherwise led to believe that she had been granted her maternity leave as requested. (See Doc. # 33 at 25-28.) However, she has absolutely no evidence that this mistake was intentional. (In fact, Dixon readily admits that both Fricks and Clay appeared to be understanding and sympathetic regarding issues surrounding her pregnancy. (See Pl. Dep. at 89-90.)) Rather, each party made mistakes to Dixon's detriment. The company failed to code plaintiff within the automated system as being on approved leave. Dixon relied on purported representations from her immediate supervisor that she had done everything needed to effectuate her leave. These mistakes ignited a series of unfortunate events which brought to light Dixon's conviction for property theft from a former employer. The conviction gave CVS reasonable hesitation to re-hire Dixon to her former position and Dixon's re-application for employment was subsequently denied.

What is missing from this series of unfortunate events is *intent* – not even a scintilla of evidence of intent exists. Therefore, defendant's motion for summary judgment on plaintiff's pregnancy discrimination act claim is due to be granted.

---

[21] The court disregards those arguments of pretext which rely on the unauthenticated and otherwise inadmissible transcript of the telephone conversation with Kimberly Clay. See footnote 2, supra.

## B.    Negligence (Count II)

Count II of plaintiff's complaint alleges that CVS had a duty to make reasonable attempts to contact plaintiff that her employment was about to be terminated, and that CVS breached that duty when it failed to notify her.[22]   (See Compl. ¶¶ 24-29.)  To establish a prima facie case of negligence, a plaintiff must show: (1) that the defendant owed her a duty of care; (2) that the defendant breached the duty by negligent act or omission; (3) that defendant's breach was the actual and proximate cause of plaintiff's injury; and (4) that she suffered some injury.  See Lowe's Home Cntrs., Inc. v. Laxson, 655 So.2d 943, 945-46 (Ala. 1994).  The absence of any one of these elements renders the evidence insufficient to establish a claim for negligence.  See Calvert Fire Ins. Co. v. Green, 180 So. 2d 269, 273 (Ala. 1965) ("When these elements are brought together, they unitedly constitute actionable negligence.  The absence of any one of these renders a complaint bad or the evidence insufficient").

---

[22] Plaintiff does not address the legal standards governing her claim for negligence in her brief.  Thus, only a cursory analysis of this claim is warranted, as plaintiff has arguably abandoned the claim.  See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in party's initial response to motion for summary judgment).  In fact, the only mention made of the negligence claim asserts a *different* bases for that claim than is alleged in the Complaint.  (See Doc. # 33 at 24.)  Such an attempt to amend the pleadings at the summary judgment stage is inappropriate and will be wholly disregarded by the court.  See FED. R. CIV. P. 15(a).

Plaintiff's claim for negligence is flawed on a very basic level.  Dixon's employment with CVS was at-will.  (<u>See</u> Doc. # 32, Exh. K.)[23]  As such, Dixon could be terminated from her position at CVS at any time, with or without cause.  <u>See</u> <u>Bell v. South Central Bell</u>, 564 So. 2d 46, 47 (Ala. 1990).  This court has heretofore recognized that, because an employer has the right to terminate an employee-at-will for any reason whatsoever, "it is only logical to conclude that [the employer] has no legal obligation to inform plaintiff[] of any or all grounds that could result in [her] employment being terminated."  <u>See</u> <u>Wade v. Chase Manhattan Mortgage Co.</u>, 994 F. Supp. 1369, 1384 (N.D. Ala. 1997); <u>see</u> <u>also</u> <u>White v. I.T.T.</u>, 718 F.2d 994, 997 (11th Cir. 1983) (holding that, because plaintiff was an employee terminable at-will, "any executory promises arising out of the employment relationship, including a promise to re-instate after maternity leave, were wholly unenforceable").

---

[23] "Your Guide to CVS" contains a disclaimer:

> Neither this guide nor any other communication by a management representative, whether oral or written, is intended in any way to create a contract of employment. Both you and CVS are free to end your employment relationship at any time with or without notice or cause.  In other words, your status with CVS is that of an "employee-at-will."

(<u>See</u> Doc. # 32, Exh. K at CVS 0167.)

23

Therefore, defendant's motion for summary judgment as it relates to plaintiff's negligence claim is due to be granted.

A separate order will be entered.

**DONE** this the ___9th___ day of July, 2007.


_____

SENIOR UNITED STATES DISTRICT JUDGE